UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| AMY FYFFE, | ) | CASE NO. 1:17CV2660 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | Magistrate Judge George J. Limbert |
| v. | ) | |
| | ) | |
| NANCY A. BERRYHILL[1], | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | Report and Recommendation of |
| SECURITY ADMINISTRATION, | ) | Magistrate Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Amy Fyffe ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying her application for Disability Insurance Benefits ("DIB"). ECF Dkt. #1. In her brief on the merits filed on May 22, 2018, Plaintiff asserts that the administrative law judge ("ALJ") committed error by failing to apply the proper legal standards to her fibromyalgia symptoms and by failing to properly evaluate and attribute proper weight to the opinions of her treating physician. ECF Dkt. #15. On June 21, 2018, Defendant filed a brief on the merits. ECF Dkt. #16. Plaintiff did not file a reply brief.

For the following reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND the instant case for proceedings consistent with this Report and Recommendation.

## I.    FACTUAL AND PROCEDURAL HISTORY

On October 1, 2014, Plaintiff protectively filed an application for DIB, alleging disability beginning January 1, 2013, due to fibromyalgia, arthritis, degenerative joint disease ("DJD") in the knee and lumbar spine, migraines, colitis, and spondylolisthesis of the lumbar region. ECF Dkt. #12 ("Tr.") at 361-362, 436.[2] Plaintiff's application was denied initially and upon reconsideration. *Id.*

---

[1]On January 20, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2]All citations to the transcript refer to the page numbers assigned when the transcript was filed in the CM/ECF system rather than the page numbers assigned when the transcript was compiled. This allows the

at 300-313.  Following the denial of her application, Plaintiff requested an administrative hearing, and on August 10, 2016, an ALJ conducted an administrative hearing and accepted the testimony of Plaintiff, who was represented by counsel, and a vocational expert ("VE").  *Id.* at 251, 315.  On October 24, 2016, the ALJ issued a decision denying Plaintiff's application for DIB.  *Id*. at 12-24.

On December 1, 2016, Plaintiff, through counsel, filed a request for review of the ALJ's decision and on October 17, 2017, the Appeals Council denied Plaintiff's request for review.  Tr. at 1-4, 359-360.

On December 20, 2017, Plaintiff filed a complaint in this Court.  ECF Dkt. #1.  On May 22, 2018, Plaintiff filed her brief on the merits.  ECF Dkt. #15.  On June 21, 2018, Defendant filed her brief on the merits.  ECF Dkt. #16.  Plaintiff did not file a reply brief.

## II.    RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

### A.    MEDICAL EVIDENCE

The undersigned will highlight the medical evidence pertaining to Plaintiff's fibromyalgia, since it is the primary basis of her assertions of error.  It is noted, however, that Plaintiff has a "well-documented history of fibromyalgia and spondylolisthesis of the lumbar region, spinal stenosis, and lumbar radiculitis.  Plaintiff also suffers from osteoarthritis following a left knee replacement and chronic migraine headaches and fibromyalgia."  ECF Dkt. #15 at 2, citing Tr. at 545, 569, 609, 915, 961, 929, 1085, 1087.  The undersigned notes that the ALJ found that Plaintiff's migraine headaches, carpal tunnel syndrome, hyperlipidemia were not severe impairments at Step 2 of the sequential evaluation and Plaintiff does not challenge these findings.

The relevant medical history in the file concerning Plaintiff's fibromyalgia shows that she had been treating with Dr. Fox, M.D., from Metrohealth Medical Center and an assistant professor of physical medicine and rehabilitation at Case Western Reserve University, since before February 4, 2013, which was labeled a follow-up encounter for her low back pain.  Tr. at 532-537.  On that date, Dr. Fox noted that Plaintiff reported improvement with her pain.  *Id*. at 533.  She stated that

---

Court and the parties to easily reference the transcript as the page numbers of the .PDF file containing the transcript correspond to the page numbers assigned when the transcript was filed in the CM/ECF system.

the higher dose of Neurontin that she had been prescribed helped with her fibromyalgia, but she was having hypotensive episodes. *Id.* She was continuing her home exercise program almost daily and she quit her second job recently, which she thought had help to lessen her pain. *Id.* She indicated that she no longer had stabbing low back pain, but did have stiffening in her knees at night. *Id.* She reported partial relief with Tramadol and was using it only once per week and had not used a Flexeril prescription since her last visit. *Id.* Dr. Fox's notes indicated that he saw her at the request of Plaintiff's treating physician, Dr. Behmer, for her low back pain. *Id.* He noted that Plaintiff had a prior medical history of fibromyalgia and she had no relief of her back pain even with physical therapy. *Id.* Dr. Fox noted that Plaintiff could ambulate and perform her daily activities, and she worked full-time as a machine operator, which required her to lift 30 or more pounds with frequent stooping, bending, and pushing. *Id.* at 534.

Physical examination showed that Plaintiff had no tenderness on palpation in the lumbosacral paraspinals, no tenderness over the bilateral PSIS, and no tenderness over the bilateral greater trochanter. Tr. at 535. Plaintiff had no paraspinal spasms, normal spine and hip ranges of motion, with some minor back pain at flexion, and fibromyalgia trigger points that were positive in 5 of 18 spots. *Id.* at 536. Dr. Fox noted Plaintiff's prior MRIs which showed severe degenerative facet arthropathy at L5-S1 contributing to grade 1 spondylolisthesis of L5 on S1, mild lumbar levoscoliosis with slight rotary component, and disc space narrowing at L4-L5 and L5-S1 with anterolisthesis of L5 with respect of S1. *Id.* Dr. Fox diagnosed Plaintiff with myalgia and myositis, primary localized osteoarthrosis of the lower leg, lumbar spondylosis and spondylolisthesis, and fibromyalgia improving with Neurontin and home exercise program. *Id.* He continued her medications and her home exercise program and he discussed the importance of exercise in controlling Plaintiff's fibromyalgia symptoms. *Id.*

Plaintiff followed up with Dr. Fox on January 27, 2014. Tr. at 496. She reported that her low back pain had been well as of late. *Id.* She was taking Tramadol twice per day and Flexeril twice per week, as well as Voltaren gel and Neurontin. *Id.* She indicated that her sleep was fair and she was walking daily with her dog and exercising almost daily. *Id.* Dr. Fox noted that Plaintiff was able to ambulate and perform her daily living activities, and she was working full-time as a machine

operator, which included duties of lifting to 30 pounds, and frequent stooping, bending and pushing. *Id*. at 497-498.  Upon examination, Dr. Fox found that Plaintiff had no tenderness or spasms in the lumbosacral paraspinals, or over the bilateral PSIS or the bilateral greater trochanter. *Id*. at 498. Plaintiff had normal spine and hip ranges of motion with minor pain in the spine. *Id*. at 498-499. Dr. Fox noted that fibromyalgia trigger points were positive in 3 of 18 spots. *Id*. at 499.  He reviewed Plaintiff's x-rays and diagnosed spondylolisthesis of the lumbar region, lumbar spondylosis, primary localized osteoarthrosis of the lower leg, ACL tear, and history of fibromyalgia that was improving with Neurontin and home exercise program. *Id*. at 500.  He continued her medications and home exercise program. *Id.*  Dr. Fox reminded Plaintiff of how important exercise was in controlling her fibromyalgia symptoms. *Id.*

On September 30, 2014, Plaintiff followed up with Dr. Fox and reported that her workplace was no longer offering her a full time position.  She noted that she was going to file for disability and was looking for an attorney. Tr. at 566.  Plaintiff rated her pain at 9 out of 10 and indicated that she was taking Tramadol 3 times per day for pain, and taking Flexeril twice per week. *Id*. She had some relief with IcyHot, minimal relief with Voltaren gel, and had some help from Neurontin. *Id*. She was not sleeping at night, and she reported that exercising was difficult as of late. *Id.* Dr. Fox's physical examination indicated that Plaintiff was in no distress, was pleasant, and she had no tenderness in the lumbosacral paraspinals, over the bilateral PSIS, or over the bilateral greater trochanter. *Id*. at 569.  He found no paraspinal spasms, normal ranges of motion in the spine and hips with minor spine pain, and fibromyalgia trigger points were positive in 18 out of 18 spots. *Id.* Dr. Fox diagnosed spondylolisthesis of lumbar region, lumbar spondylosis, primary localized osteoarthrosis of the lower leg, lumbar radiculitis, and history of fibromyalgia. *Id*. at 570.  He noted that Plaintiff's fibromyalgia was improving with Neurontin and the home exercise program, but she had a relapse and was much worse overall. *Id*. He indicated that opiates may be contributing. *Id*. He continued Plaintiff's Neurontin, Topamax, Voltaren gel, and Flexeril, but wanted her to wean off of Tramadol, and told her to resume her home exercise program once her pain was reduced. *Id.* They discussed how important exercise and stress management were to controlling fibromyalgia symptoms. *Id.*

-4-

Plaintiff followed up with Dr. Fox on December 2, 2014 for her low back pain. Tr. at 558-564, 944-950. She indicated that her fibromyalgia was really difficult for her as of late. *Id.* Dr. Fox noted that, "[r]ecall that she was told her workplace is no longer offering her full time position. She noted she is going to file for disability and has pursued an attorney." *Id.* Plaintiff rated her pain at 8 out of 10 and indicated that she was weaning off of Tramadol and taking Flexeril twice per week. *Id.* She had some relief with IcyHot, minimal relief with Voltaren gel, and had some help from Neurontin. *Id.* She was not sleeping at night, and she reported that exercising was difficult. *Id.* Dr. Fox's physical examination indicated that Plaintiff was in no distress, was pleasant, had no tenderness in the lumbosacral paraspinals, over the bilateral PSIS, or over the bilateral greater trochanter. *Id*. at 562. He found no paraspinal spasms, normal ranges of motion in the spine and hips with minor spine pain, and fibromyalgia trigger points were positive in 18 out of 18 spots. *Id.* Dr. Fox diagnosed spondylolistehesis of lumbar region, lumbar spondylosis, primary localized osteoarthrosis of the lower leg, lumbar radiculitis, and history of fibromyalgia. *Id*. at 561. He noted that Plaintiff was working full-time as a machine operator and was a student seeking an Associate's Degree. *Id.* Dr. Fox noted that Plaintiff's fibromyalgia was improving with Neurontin and the home exercise program, but she had a relapse and was much worse overall. *Id*. at 563. He indicated that opiates may be contributing. *Id.* He continued Plaintiff's Neurontin, Topamax, Voltaren gel, and Flexeril, prescribed Vicodin since Plaintiff was weaning off of Tramadol, and told her to resume her home exercise program once her pain was reduced. *Id.* at 564. They discussed how important exercise and stress management were to controlling fibromyalgia symptoms. *Id.*

Plaintiff followed up with Dr. Fox on February 3, 2015, for low back pain, knee pain, and foot/ankle pain. Tr. at 924. Plaintiff reported that her pain had improved since the last visit due to more regular exercise. *Id.* She indicated that fatigue continued to be a concern for her. *Id.* She complained that most of her pain was in her low back and she rated it at a 7 out of 10. *Id.* Plaintiff took 10 Vicodin in two months for the pain, and she reported that Flexeril was helping, which she took twice per week. *Id.* at 925. She had partial relief with IcyHot, minimal relief with Voltaren gel, and was taking Neurontin as well. *Id.* She indicated that her fibromyalgia was really difficult for her as of late. *Id*. Dr. Fox noted that, "[r]ecall that she was told her workplace is no longer

offering her full time position.  She noted she is going to file for disability and has pursued an attorney." *Id.*          Dr. Fox's physical examination indicated that Plaintiff was in no distress and was pleasant, she had concordant tenderness in the lumbosacral paraspinals, and no tenderness over the bilateral PSIS or over the bilateral greater trochanter.  Tr. at 928.  He found no paraspinal spasms, normal ranges of motion in the spine and hips with minor spine pain, and fibromyalgia trigger points were positive in 13 out of 18 spots.  *Id.* Dr. Fox diagnosed spondylolisthesis of lumbar region, lumbar spondylosis, primary localized osteoarthrosis of the lower leg, lumbar radiculitis, and history of fibromyalgia.  *Id*. at 929.  Dr. Fox noted that Plaintiff's fibromyalgia was controlled with Neurontin and the home exercise, and she was doing better since she had weaned off of most of the opiates.  *Id*.  He gave her a steroid injection in the bilateral S1, discussed circuit training with her to keep her heart rate elevated, continued her Neurontin, Topamax, Voltaren gel, Vicodin and Flexeril, and told her to resume her home exercise program once her pain was reduced.  *Id.* at 930.  They discussed the importance of exercise and stress management in controlling fibromyalgia symptoms.  *Id.*

Plaintiff followed up with Dr. Fox on June 8, 2015 for her complaints of low back, knee and foot/ankle pain.  Tr. at 1253.  She reported that her pain had worsened and she fell a month before on an uneven sidewalk while walking in high heels.  *Id*.  She reported that her low back pain flared up and she had about 50% pain relief prior to the fall.  *Id.*  She complained of fatigue, but indicated that she participated in a relay for life the day prior.  *Id*.  She rated her pain at a 10 out of 10 with radiation from her back into her buttocks.  *Id*.  She reported that her fibromyalgia had been really difficult for her as of late and she had been rejected for disability benefits a second time.  *Id*. at 1254.

Physical examination by Dr. Fox noted concordant tenderness in the lumbosacral paraspinals, no tenderness over the PSIS or the bilateral greater trochanter, and no spasms.  Tr. at 1256.  Dr. Fox diagnosed spondylolisthesis of the lumbar region, lumbar spondylosis, primary localized osteoarthrosis of the lower leg, lumbar radiculitis, and history of fibromyalgia.  *Id*. at 1257.  He gave Plaintiff a steroid injection at the bilateral S1and told her to continue her home exercise program when her pain decreased, and to continue her medications.  *Id*. at 1258.

On September 1, 2015, Plaintiff followed up with Dr. Fox for her low back, knee and foot/ankle pain.  Tr. at 1215.  She reported that her back pain was worse, but her fibromyalgia pain was stable.  *Id*.  She indicated that she was seeing a chiropractor and going to physical therapy, which provided temporary relief.  *Id.*  She complained of fatigue, which she felt was interfering with her life.  *Id*.  She also stated that she was no longer working and was awaiting disability.  *Id*.  She continued to paint and complete her projects.  *Id*.  She described her low back pain as feeling like she had performed 50 squats per day, and if she lifted anything, she felt a stabbing in her back.  *Id*.  She reported that she last received a steroid injection in February of 2015 and it did help a lot.  *Id.* at 1216.  She stated that she wanted to come back for another one, but did not because she did not want to be doing both chiropractic treatment and injections.  *Id*.  Physical examination by Dr. Fox revealed tender points and spasm in the upper trapezius, but no evidence of trigger points.  *Id*. at 1218.  She also had tenderness at the PSIS, SI joint, bilateral buttocks, but no evidence of spasms or trigger points.  *Id.* at 1219.   Plaintiff also had multiple tender points throughout her trunk.  *Id*.  Dr. Fox diagnosed spondylolisthesis of the lumbar region, lumbar spondylosis, primary localized osteoarthrosis of the lower leg, lumbar radiculitis, and history of fibromyalgia.  *Id*. at 1219-1220.  He gave her a steroid injection at the bilateral S1 and told her to continue her home exercise program, stop the Voltaren, increase Neurontin, and continue Topamax and Robaxin.  *Id*. at 1220.

Dr. Fox gave Plaintiff two epidural steroid injections on October 14, 2015.  Tr. at 1199.

Dr. Fox followed up with Plaintiff on November 3, 2015 for her low back, knee, foot, and ankle pain.  Tr. at 1190.  She reported 75% relief in her low back pain after a prior steroid injection in October of 2015.  *Id*. She reported more frequent migraines, increased neck pain, left-sided rib pain, and better knee and foot/ankle pain.  *Id.*  Physical examination indicated that Plaintiff had spasm and triggering to the bilateral upper trapezoids, left greater than right, and palpation of the left great occipital nerve causing paresthesias into the neck.  *Id*.  Plaintiff's range of motion in the upper extremities was mildly decreased.  *Id*.  Her lower musculoskeletal examination showed no tenderness over the bilateral lumbosacral paraspinals, over the PSIS or over the bilateral greater trochanter.  *Id.* at 1193.  There was discordant pain radiating down the back of the left leg when Plaintiff had to extend and rotate her lower spine to the left.  *Id.* Plaintiff also had triggering and

muscle spasm and concordant pain to palpation over the left ribs, 9 and 10, and Plaintiff had 12 out of 18 tender fibromyalgia points.  *Id*. at 1194.  Dr. Fox diagnosed myalgia and myositis, trigger point of neck, trigger point of thoracic region, cervical strain, spondylolisthesis of the lumbar region, spondylosis of the lumbar region and history of fibromyalgia.  *Id.*  An x-ray of the cervical spine was ordered, and Plaintiff was prescribed Lyrica, continued on her medications of Topamax and Robaxin, and she was told to wean off of Neurontin and continue her home exercise program and physical therapy.  *Id*. at 1195.  A cervical spine x-ray dated November 3, 2015 showed abnormal curvature of the spine with minor degenerative changes.  *Id.* at 1302.

Plaintiff presented to Dr. Fox on December 15, 2015 for follow up, noting minimal change since her last visit.  Tr. at 1185.  She had switched her medication from Neurontin to Lyrica, but reported little help, except for her rib pain.  *Id*.  Her neck pain and headaches continued, as well as her bilateral palmer paresthesias.  *Id.*  She was exercising several days per week.  *Id.*  Examination revealed triggering in the upper trapezoids, normal neck range of motion, and an otherwise unremarkable neurologic exam.  *Id.*  She was given a trigger point injection, her Lyrica was increased, her other medications were continued, and further trigger point injections were to be considered at the next visit.  *Id*. at 1186.  Plaintiff was also advised to continue her home exercise program.  *Id*.

On February 16, 2016, Plaintiff presented to Dr. Fox for follow up of her low back, knee, foot and ankle pain. Tr. at 1139.        She reported minimal low back pain relief after a January 2016 steroid injection.  *Id*. She noted that she had buttocks pain and pain radiating into her anterior thighs.  *Id*.  She noted less whole body sensitivity to pain on Lyrica than when she was on Neurontin and she was able to take showers without it being painful.  *Id*.  She was attending a gym 2-3 times per week to help with the pain.  *Id*.  She rated her pain as 5 out of 10.  *Id*.

Dr. Fox's physical examination indicated that Plaintiff was in no distress, was pleasant, had spasm and triggering to the bilateral upper trapezoids, left greater than right, no cervical spine tenderness, and mildly decreased range of motion in the upper extremities, with concordant pain at bilateral bending end range.  Tr. at 1142.  He noted concordant tenderness over the superior sacral sulcus, and no tenderness over the lumbosacral paraspinals or the bilateral greater trochanter,

minimal paraspinal spasm, and discordant pain radiating down the back of the left leg with spine extension and rotation to the left. *Id*. at 1143. Plaintiff had 12 out of 18 tender fibromyalgia trigger points, although beside this finding, it said, "(12/2015)." *Id.* Based upon his examination, and more recent diagnostic imaging, Dr. Fox diagnosed Plaintiff with myalgia and myositis, osteoarthritis of the cervical spine, unspecified spinal osteoarthritis in a complication status, spondylolisthesis of lumbar region, lumbar spondylosis without myelopathy or radiculopathy, lumbar radiculitis, and history of fibromyalgia. *Id*. at 1144. He continued Plaintiff's medications, encouraged her to continue her home exercise program and physical therapy, and he was considering lumbar or cervical branch blocks when she returned in 2 months if necessary, but he wanted to control Plaintiff's fibromyalgia pain a little better first. *Id*.

On April 19, 2016, Plaintiff presented to Dr. Fox for follow up of her low back, knee and foot and ankle pain. Tr. at 1115. She reported ongoing buttock pain which radiated into her anterior thighs. *Id*. She noted less whole body sensitivity to pain on Lyrica than when she was taking Neurontin and she could now enjoy showers. *Id.* She further indicated that Zanaflex worked well at night, but she had trouble getting up in the morning. *Id.* She was taking Topamax, the Lidocaine gel that she tried did not help, and she was taking Magnesium and Turmeric over the counter for her fibromyalgia pains and headaches. *Id*. She had taken 10 Vicodin over the past 3 weeks. *Id*. Plaintiff completed 9 physical therapy visits for her neck and was making progress, and she was attending a gym 2-3 times per week to help with the pain. *Id*. Dr. Fox's physical examination indicated that Plaintiff was in no distress, was pleasant, had spasm and triggering to the bilateral upper trapezoids, left greater than right, no cervical spine tenderness, and normal range of motion in the upper extremities, with minimal pain. Tr. at 1118. He noted concordant tenderness to palpation over the superior sacral sulcus, no tenderness over the lumbosacral paraspinals or the bilateral greater trochanter, minimal paraspinal spasm, and normal ranges of motion in the spine except for discordant pain radiating down the back of the left leg with extension and rotation to the left. *Id*. at 1118-1119. He noted fibromyalgia trigger points were positive in 12 out of 18 spots. *Id.* Based upon his examination, and more recent diagnostic imaging, Dr. Fox diagnosed Plaintiff with myalgia and myositis, lumbar radiculitis, osteoarthrosis involving the lower leg, osteoarthritis of the

cervical spine in a complication status, spondylolisthesis of lumbar region, lumbar spondylosis without myelopathy or radiculopathy, and history of fibromyalgia.  *Id*. at 1120.  He continued her medications, referred her for a neurology consultation for headache management, and encouraged her to continue exercising and physical therapy.  *Id*.

On May 19, 2016, Dr. Fox wrote a letter "To whom it may concern," indicating that he had treated Plaintiff for the last four years and was familiar with her medical impairments based upon numerous examinations.  Tr. at 1060.  He diagnosed Plaintiff with fibromyalgia and explained that he made this diagnosis based upon examinations, including tender points in classic locations, chronic fatigue complaints, abdominal distress, and by ruling out other conditions.  *Id*.  Dr. Fox indicated that Plaintiff's "chronic pain and fatigue can be debilitating at times.  She has good and bad days, but the bad days seem to occur more often."  *Id.* He indicated that Plaintiff could not predict when she would have bad days, which was normal for fibromyalgia sufferers, and he found Plaintiff's complaints of pain and fatigue credible and consistent with her condition.  *Id*.  Dr. Fox opined that it would be difficult for Plaintiff to work full-time because she would be unable to notify her employer in advance of absences and he believed that she would miss at least 3-4 days per month due to chronic pain, and on her better days where she could make it to work, Plaintiff's pain levels would be high and worsen as the day progressed.  *Id*. at 1060.  Dr. Fox stated that this would also affect Plaintiff's ability to concentrate and cause her to be off task and unable to complete tasks. *Id.*  June 15, 2016 x-rays of the right foot ordered for Plaintiff's complaints of right top foot pain showed no abnormalities.  Tr. at 1285.  June 18, 2016 x-rays of Plaintiff's right great toe suggested a hairline nondisplaced fracture of the right great toe distal phalanx.  *Id.* at 1283.  Clinical correlation was recommended.  *Id*.

On July 11, 2016, Plaintiff presented to Dr. Fox for follow up of her low back, knee and foot and ankle pain.  Tr. at 1080.  She noted new right foot and toe pain after a pot fell on her foot and she was seeing a podiatrist.  *Id*.  She also noted that her back pain continued and radiated into her right lower limb and bilateral calves.  *Id*. at 1081.  She reported that she could not stand for very long when her pain flared up and Lyrica seemed to help her muscle fatigue, which she had only when she overexerted herself.  *Id*.  She was tolerating all of her medications well and indicated that

Zanaflex worked well at night, but she was feeling especially fatigued during the day over the past few weeks. *Id*. Plaintiff completed 9 physical therapy visits for her neck and was making progress, and she was attending a gym 2-3 times per week to help with the pain. *Id*.

Dr. Fox's physical examination indicated that Plaintiff was in no distress, was pleasant, had spasm and triggering to the bilateral upper trapezoids, left greater than right, no cervical spine tenderness, and normal range of motion in the upper extremities, with minimal pain. Tr. at 1084. He noted concordant tenderness to palpation of the lumbosacral paraspinals and the PSIS, no tenderness over the bilateral greater trochanter, minimal paraspinal spasm, and normal ranges of motion in the spine with no spine pain, and fibromyalgia trigger points were positive in 12 out of 18 spots. *Id*. Based upon his examination, and more recent diagnostic imaging, Dr. Fox diagnosed Plaintiff with myalgia and myositis, osteoarthritis of the cervical spine, unspecified spinal osteoarthritis in a complication status, spondylolisthesis of lumbar region, lumbar spondylosis without myelopathy or radiculopathy, and history of fibromyalgia. *Id*. at 1086. He ordered an x-ray of Plaintiff's lumbar spine, continued her medications, referred her for a neurology consultation for headache management, and encouraged her to continue exercising and physical therapy. *Id*. He discussed lumbar or cervical branch blocks upon her return in 2 months if necessary, but he noted that he wanted to control her fibromyalgia pain a little better first. *Id*.

July 11, 2016 x-rays of the lumbar spine showed instability at the L5-S1 level secondary to significant degenerative facet disease resulting in increased anterolisthesis of L5 relative to S1 at flexion relative to extension. Tr. at 1278. The x-rays also showed progression of L5-S1 degenerative disc disease ("DDD") compared to the last x-rays of June 26, 2012. *Id*.

## B.      TESTIMONIAL EVIDENCE

On August 10, 2016, the ALJ held a hearing in which Plaintiff, represented by counsel, testified. Tr. at 251. A VE also testified. *Id*. Counsel for Plaintiff requested to amend the disability onset date for Plaintiff to January 31, 2014, which the ALJ granted. *Id*. at 12, 257.

Plaintiff testified that she was born in 1973 and has lived with her parents since 2012. Tr. at 257-258. She has a driver's license and drives a car, although her dad drove her to the hearing. *Id*. at 259. She reported that she worked last year for a couple of months doing filing at a cleaning

-11-

company owned by a friend, but she stopped working there because the company was not successful. *Id*. at 260.  Plaintiff told the ALJ that even if the company would have survived, she would have stopped working because she was getting overwhelmed due to "fibro fog." *Id*.  She described "fibro fog" as getting confused, and forgetting what she was doing while in the middle of a task, like sending an email or forgetting how to spell. *Id*.  She stated that it made it hard to communicate and to think. *Id*.  She testified that it was becoming more frequent at 2-3 times per week. *Id*. at 261.

Plaintiff also testified that she had painful tingling in both of her hands and drops things as a result. Tr at 264-265.  She discussed her back pain and "all around" pain from fibromyalgia which she rated as a 5 out of 10 on a daily basis. *Id*.  She testified that two to three times a month, her pain was so bad that she stayed in her room with the curtains closed and did not come out except to take her medications. *Id*. at 265.  She explained that these episodes lasted from 24 hours to a couple of days, and she just suffered from one two days ago, which lasted for 24 hours. *Id*.  She testified that she was currently in pain and rated it as a 6 out of 10, explaining that her hands were tingling and she had a migraine. *Id*. at 266. She also said that neck and shoulder pain make it very difficult to work with computers. *Id*. at 269.  She indicated that repetitive work with her hands is also a problem, like when she had to fold fliers from the rental agent position, it affected her hands, neck and shoulders. *Id*. She also has trouble reaching for objects due to her neck and shoulder pain. *Id*. at 270.  Plaintiff further described her energy level a low and she indicated that she took iron twice per day and she napped from 10:00 a.m. until noon and felt unrefreshed when she awoke. *Id*. Plaintiff also indicated that she suffered from migraines. *Id*.

When asked what she did to help her pain besides stay in her room, Plaintiff explained that she sometimes took Norco for her back pain, but it was not recommended for fibromyalgia, so she did not take it often. Tr. at 266.  Plaintiff indicated that she took Lyrica three times per day and Topamax. *Id*.  She indicated that she did treat for a month or two with Dr. Orr for her back pain, and his treatment helped her temporarily. *Id*. at 266-267.  She takes hot baths in lavender Epsom salts, and her doctor suggested yoga, but she did not try it because stretching already hurt. *Id*. at 268.

When asked about a typical day, Plaintiff testified that she does what she can to help around the house and with the animals. Tr. at 267.  She walks the dog, although not everyday, and she

-12-

makes coffee in the morning, makes breakfast for the family, and sometimes grocery shops with her dad.  *Id*. at 267-268.  She does not clean the house, vacuum or do the laundry.  *Id*. at 268.  She testified that on some days, just taking a shower exhausts her.  *Id*. at 267.  She sleeps at night for about four hours until she wakes up at 3:30 a.m. with back pain and neck pain.  *Id*. at 268-269.  She used to go to church, but does not anymore and she used to play sports.  *Id*. at 272.

The ALJ and Plaintiff discussed her prior work history, with Plaintiff testifying that she started working at First Harsax Management in 2009 "off and on" on a part-time basis.  Tr. at 261.  She explained that she was a rental agent who showed apartments and she did the office filing.  *Id*.  She also worked there in 2014 from 19-25 hours per week.  *Id.* at 262.  She stopped working there in May of 2015 to start working for her friend.  *Id.* at 263.  She also described her position as a machine operator for 15 years at Dennison Manufacturing.  *Id*.  She indicated that the lightest load that she lifted in that position was 45 pounds and she was on her feet all of the time.  *Id.* at 263-264.  She had to miss work there and took FMLA for her fibromyalgia and had to quit because she could not handle the weight lifting required.  *Id.* at 271.  She also missed work as a rental agent due to her fibromyalgia and she had trouble walking up and down the stairs.  *Id.* at 272.  Plaintiff testified that she also missed work when she worked for her friend due to the "fibro fog."  *Id.*

The ALJ then questioned the VE, who characterized Plaintiff's past work.  Tr. at 273-274.  The ALJ asked him to assume a hypothetical individual with Plaintiff's age, education, and work experience, with the ability to perform light work with limitations to occasionally climbing ramps and stairs, never climbing ladders, ropes or scaffolds, occasionally balancing and stooping, never kneeling, stooping or crouching, and only occasional exposure to unprotected heights.  *Id*. at 274.  The VE stated that such a hypothetical individual could perform Plaintiff's past work as a rental agent, and she could perform other jobs existing in significant numbers in the national and regional economies, such as small products assembler, produce weigher, and a labeler/marker.  *Id*. at 274-275.    The ALJ asked the VE to assume a hypothetical individual with Plaintiff's age, education, and work experience, and the same limitations from the first hypothetical individual, with the ability to handle, finger and feel frequently bilaterally.  Tr. at 276.  The VE responded that the second hypothetical individual could perform Plaintiff's past work as a rental agent, and she could perform

-13-

other jobs existing in significant numbers in the national and regional economies, such as the produce weigher and a bakery worker racker. *Id*. The VE also indicated that an employer would tolerate up to one day per month of absences, but not more than one absence per month as all competitive employment would be precluded. *Id*. at 277.

**III**.   **ALJ'S DECISION**

In his October 24, 2016 decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of January 31, 2014[3] since the work that Plaintiff did perform during the relevant time did not constitute substantial gainful activity based upon the income earned by Plaintiff and her testimony. Tr. at 14.

The ALJ further found that Plaintiff had the severe impairments of fibromyalgia, intussusception and other gastrointestinal problems, DDD and osteoarthritis status post left knee replacement. Tr. at 15. He further found that these impairments, individually or in combination, did not meet or equal any of the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). *Id*. at 15-16. The ALJ thereafter determined that Plaintiff had the RFC to perform light work with the following limitations: she could occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; she could occasionally balance and stoop; she could never kneel, crouch, or crawl; and she was limited to occasional exposure to unprotected heights. *Id*. at 16-22.

In his decision, the ALJ reviewed the medical opinions in the file, including the opinion letter of Plaintiff's treating physician, Dr. Fox. Tr. at 20-22. The ALJ afforded limited weight to Dr. Fox's opinion, gave some weight to Plaintiff's physical therapist, and he attributed great weight to the opinions of the agency reviewing physicians. Tr. at 20-22. The ALJ also discounted Plaintiff's credibility, finding that her statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible. *Id*. at 19-20.

---

[3] The ALJ erroneously indicated that Plaintiff had not engaged in substantial gainful activity "since January 1, 2013, the alleged onset date." Tr. at 14. This is contrary to his finding on the first page of his decision as he indicated that he granted counsel for Plaintiff's request at the hearing to amend Plaintiff's disability onset date from January 1, 2013 to January 31, 2014. *Id.* at 12. The transcript of the ALJ hearing also reflects the amended onset date request. *Id.* at 255, 257.

Based upon the testimony of the VE and his RFC for Plaintiff, the ALJ determined that Plaintiff could perform her past relevant work as a leasing agent. Tr. at 22. He also found that Plaintiff could perform other jobs existing in significant numbers in the national economy, including the jobs of small products assembler, produce weigher, and marker. *Id*. at 23. The ALJ thus held that Plaintiff was not disabled under the Social Security Act through the date of his decision. *Id.*

## IV.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.    If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.    If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this

-15-

Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## VI.    LAW AND ANALYSIS

### A.    Treating Physician Rule

Plaintiff challenges the ALJ's decision to discount the opinion of her treating physician, Dr. Fox, who wrote a letter on May 19, 2016 discussing his treatment of Plaintiff for fibromyalgia and opined that Plaintiff would have difficulty working on a full-time basis. ECF Dkt. #15 at 13-14. For the following reasons, the undersigned recommends that the Court find that the ALJ violated the treating physician rule because he failed to provide good reasons for rejecting Dr. Fox's opinion.

An ALJ must give controlling weight to the opinion of a treating source[4] if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not

---

[4] The Court notes that the SSA has changed the treating physician rule effective March 27, 2017. The SSA will no longer give any specific evidentiary weight to medical opinions, including affording controlling weight to medical opinions. Rather, the SSA will consider the persuasiveness of medical opinions using the factors specified in their rules  and will consider the supportability and consistency factors as the most important factors.

inconsistent with the other substantial evidence in the record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. Social Security Rule ("SSR") 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how her case is determined, especially when she knows that her treating physician has deemed her disabled and she may therefore "be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied." *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson,* 378 F.3d at 544).

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. 2010). The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. 2011) (quoting *Rogers*, 486 F.3d at 243 ). However, an ALJ need not discuss every piece of evidence in the administrative record so long as he considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence. *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind

-17-

to accept the ALJ's conclusion.  *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citation omitted).

If an ALJ declines to give controlling weight to the opinion of a treating source, he must determine the weight to give that opinion based upon a number of regulatory factors.  20 C.F.R. § 404.1527(c)(2).  Such factors include "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source."  *Wilson*, 378 F.3d at 544, citing 20 C.F.R. § 404.1527(c).  An ALJ is not required to discuss every factor in 20 C.F.R. § 404.1527(c).

In the instant case, the ALJ indicated that he had considered Dr. Fox's May 2016 opinion and he noted that Dr. Fox was one of Plaintiff's treating physicians. Tr. at 24.  The ALJ set forth Dr. Fox's opinions concerning Plaintiff's likely inability to hold down a full-time job and the likelihood that Plaintiff would miss 3-4 days per month due to her chronic pain.  *Id*.  The ALJ also cited to Dr. Fox's opinion that Plaintiff's pain level would be high even when she could work on good days and his opinion that the pain would even increase throughout the day which would affect her ability to concentrate and lead to her being off task.  *Id*.  The ALJ then afforded this opinion limited weight, "because it is[was] consistent[sic] with the general pattern of evidence contained in the hearing level record.  Specifically, these opinions are generally inconsistent with the mild to moderate findings from clinical examinations and diagnostic imaging."  *Id*.  Apparently, the ALJ mistyped this sentence and must have meant that Dr. Fox's opinion was *consistent* with the general pattern of evidence, not *inconsistent* with the general pattern of evidence contained in the hearing level record.  The ALJ then cited to numerous examinations in the record documenting these mild to moderate clinical findings and diagnostic images.  *Id*.

The undersigned recommends that the Court find that the ALJ's reliance upon this sole reason for affording less than controlling weight to Dr. Fox's opinion violates the treating physician rule and social security law concerning fibromyalgia.  As Sixth Circuit caselaw holds, fibromyalgia is not amenable to objective diagnosis and standard clinical tests are "not highly relevant" in diagnosing or assessing fibromyalgia or its severity. *Preston v. Sec'y of Health and Human Servs.*,

-18-

854 F.2d 815, 820 (6th Cir. 1988); *see also Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243-244 (6th Cir. 2007)("in light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely upon objective evidence are not particularly relevant"). Those who suffer from fibromyalgia "manifest normal muscle strength and neurological reactions and have a full range of motion." *Rogers*, 486 F.3d at 244 (quoting *Preston*, 854 F.2d at 820). Moreover, in evaluating fibromyalgia in the context of Step Four and RFC, Social Security Ruling 12-2p, entitled "Evaluation of Fibromyalgia," indicates that "for a person with FM [fibromyalgia], we will consider a longitudinal record whenever possible because the symptoms of FM can wax and wane so that a person may have 'bad days and good days.'" SSR 12-2p.

While the ALJ mentioned earlier in his decision that he had considered the longitudinal record, he failed to explain why he afforded less than controlling weight to Dr. Fox's opinion concerning Plaintiff's fibromyalgia and its impact on her ability to work beyond mentioning the mild to moderate clinical examination findings and diagnostic imaging. The ALJ failed to discuss Dr. Fox's opinion as to Plaintiff's debilitating chronic pain and fatigue, the waxing and waning of her symptoms, his opinion concerning her being off task, or his belief that Plaintiff would have difficulty performing full-time work and even performing full-time work on good days. Accordingly, the undersigned recommends that the Court find that the ALJ violated the treating physician rule in regard to Dr. Fox's opinion as to Plaintiff's fibromyalgia.

The undersigned further recommends that the Court find that the ALJ's violation of the treating physician rule is not harmless error. As the Sixth Circuit recognizes, a violation of the good reasons requirement could constitute harmless error in three circumstances: (1) where the treating source's opinion was patently deficient; (2) where the Commissioner made findings consistent with the treating source's opinion; or (3) where the Commissioner otherwise met the goal of 20 C.F.R. § 416.927(c)(2). *Cole*, 661 F.3d at 940. Here, the opinion of Dr. Fox was not patently deficient on its face, the ALJ did not make findings consistent with that opinion, and the goal of the regulation was not otherwise met because the ALJ's decision does not permit meaningful judicial review. Accordingly, the undersigned recommends that the Court find that the ALJ's treatment of the opinion of Dr. Fox did not constitute harmless error.

### B.  Credibility

Plaintiff additionally argues that the ALJ improperly evaluated her statements concerning the intensity, persistence and limiting effects of her fibromyalgia. ECF Dkt. #15 at 7-11.  In light of the undersigned's recommendation that the Court remand this case based upon the ALJ's failure to comply with the treating physician rule, the undersigned recommends that the Court decline to address this remaining allegation as the ALJ's re-evaluation and analysis on remand may impact his findings on this issue in the remaining steps of the sequential evaluation.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 417 (6th Cir. 2011).

The undersigned points out that the ALJ reviewed a number of factors in evaluating the intensity, persistence and limiting effects of Plaintiff's fibromyalgia symptoms and her symptoms from other impairments. Tr. at 17-20.  The ALJ noted that Plaintiff had a long work history and she consistently sought treatment, which he found supported her statements regarding her symptoms and limitations.  *Id*. at 17.  He nevertheless discounted Plaintiff's complaints of pain, including her fibromyalgia symptoms and limitations, relying on the mild to moderate findings from the objective medical evidence, Plaintiff's "conservative" treatment, and the facts that she walked her dogs daily and went to the gym.  *Id*. at 17-20.  However, the ALJ did not indicate whether he considered the waxing and waning of fibromyalgia symptoms and the fact that fibromyalgia patients often show normal results on clinical examination and diagnostic imaging, like normal ranges of motion, normal strength, and normal neurological reactions.  *Preston*, 854 F.2d at 820; *Rogers,* 486 F.3d at 243-244.  Further, the ALJ described Plaintiff's treatment modalities as conservative, but failed to acknowledge that "more 'aggressive' treatment is not recommended for fibromyalgia patients." *Kalmbach v. Comm'r of Soc. Sec.*, No 09-2076, 409 Fed. App'x 852, 864 (6th Cir. Jan. 7, 2011), unpublished.  And finally, the daily living activities cited by the ALJ are not necessarily inconsistent with Plaintiff's fibromyalgia symptoms, as she testified that she walks her dogs on the days that she feels able to do so and she was going to the gym as recommended by her doctor to help control her fibromyalgia symptoms.  Tr. at 267, 270.  Thus, while the undersigned does not undertake an analysis of the ALJ's evaluation of the intensity, persistence and limitations concerning Plaintiff's

fibromyalgia symptoms, issues relating to the ALJ's analysis require additional evaluation and explanation if the Court decides to remand this case.

## VII.  CONCLUSION AND RECOMMENDATION

For the above reasons, the undersigned recommends that the Court find that the ALJ violated the treating physician rule as to Plaintiff's fibromyalgia and REVERSE the decision of the ALJ and REMAND the instant case to the ALJ for reevaluation and explanation concerning Plaintiff's fibromyalgia and the opinion of Dr. Fox.


Date: February 5, 2019                          */s/George J. Limbert*
                                                GEORGE J. LIMBERT
                                                UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. L.R. 72.3(b).